**In re IMPAC MORTGAGE HOLDINGS, INC. SECURITIES LITIGATION.**

**No. SACV 06–00031–CJC(RNBx).[1]**

United States District Court,
C.D. California,
Southern Division.

May 19, 2008.

---

1. This is a consolidated action of the following cases: *Schriver v. Impac Mortgage Holdings, Inc. et al.,* Case No. SACV 06–00031–CJC(RNBx), *Saffir v. Impac Mortgage Holdings, Inc., et al.,* Case No. SACV 06–00082–CJC(MLGx), *Mathieu v. Impac Mortgage Hold-* *ings, Inc. et al.,* Case No. SACV 06–00045–CJC(RNBx), *Kelner v. Impac Mortgage Holdings, Inc.,* Case No. SACV 06–00106–CJC(RNBx), and *Bardos v. Impac Mortgage Holdings, Inc. et al.,* Case No. SACV 06–00145–CJC(RNBx).

Nate Bear, Darren J. Robbins, Henry Rosen, Coughlin Stoia Geller Rudman and Robbins LLP, David R. Scott, Scott and Scott, Colchester, CT, David Hale Goldberger, Arthur L. Shingler, III, Scott and Scott, Brian Oliver O'Mara, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA, Peter A. Binkow, Glancy Binkow and Goldberg LLP, Los Angeles, CA, Lynda J. Grant, Labaton Sucharo and Rudoff, Robert I. Harwood, Jeffrey M. Norton, Harwood Feffer LLP, New York, NY, Venus Soltan, Soltan & Associates, Newport Beach, CA, for Plaintiffs.

Peter W. Devereaux, Jill Ray Glennon, Michele D. Johnson, Angela K. Knarr, Terri Lea Lilley, Pamela S. Palmer, Miles N. Ruthberg, Latham & Watkins LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

CORMAC J. CARNEY, District Judge.

### I. INTRODUCTION

This shareholder securities class action was brought against Impac Mortgage Holdings, Inc. ("Impac"), a publicly traded real estate mortgage company, its Chairman and Chief Executive Officer, Joseph Tomkinson, its Chief Financial Officer, Richard Johnson, and six other officers or directors of the company (collectively, "Defendants"). Plaintiffs purchased their stock in Impac over a three month period starting on May 13, 2005 and ending on August 9, 2005 (the "Class Period"). In their First Amended Consolidated Complaint ("First Amended Complaint" or "FAC"), Plaintiffs allege that the value of their stock in Impac was artificially inflated during the Class Period because of certain fraudulent statements made by Defendants regarding (1) measures to remedy internal accounting control problems and (2) future mortgage loan production. According to Plaintiffs, they incurred substantial losses after the Class Period when the value of their stock declined because the true facts regarding the remedial measures and loan production became known to the public. Plaintiffs' First Amended Complaint alleges violations of sections 10(b) and 20(a) of the 1934 Securities Exchange Act, as well as violations of SEC Rule 10b–5.

Defendants now move to dismiss the claims of the First Amended Complaint on the ground that none of those claims satis-

fy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b).[2] The Court agrees with Defendants that the allegations of the First Amended Complaint are insufficient as a matter of law. The allegations of the First Amended Complaint make clear that Defendants' statements regarding the remedial measures were not false when made and that Defendants had no intent to mislead investors when making those statements. Plaintiffs' allegations regarding remedial measures suggest, at most, that Impac's management team exhibited poor judgment, obstinacy, arrogance, and perhaps incompetence. Corporate mismanagement, however, is not actionable fraud under the securities laws. Nor are the allegations of Plaintiffs' First Amended Complaint regarding Defendants' statements on loan production actionable fraud under the securities laws. Those statements were forward-looking statements of optimism that could not have conveyed a misleading impression of the future on which a reasonable investor could rely. Moreover, those statements are protected under the Safe Harbor of the PSLRA since they were all accompanied by meaningful cautionary language. Accordingly, Defendants' motion to dismiss is GRANTED WITH PREJUDICE.

## II. ALLEGATIONS OF FAC

Impac operates a mortgage real estate investment trust ("REIT") which loans money for mortgages to owners of real estate and invests in existing mortgages. FAC, ¶ 3. To qualify as a REIT for tax purposes, a company must distribute at least 90% of its taxable income to its stockholders, of which 85% must be distributed within the taxable year to avoid the imposition of an excise tax. Id. Impac specializes in the acquisition, origination, sale and securitization of non-conforming Alt–A mortgages. Id. at ¶ 4. Alt–A mortgages are primarily first lien mortgages made to borrowers whose credit is generally within typical Fannie Mae guidelines, but who have loan characteristics that make them non-conforming under those guidelines. Id.

Prior to the beginning of the Class Period, Impac's outside auditor, KPMG, alerted Impac's management that its internal controls and operations suffered from significant deficiencies. Id. at ¶ 6. Specifically, KPMG informed Impac that (1) Impac needed to improve the evaluation and documentation of its accounting policies and procedures for complex transactions; (2) Impac did not have sufficient staff in the financial reporting department to ensure compliance with Generally Accepted Accounting Principles ("GAAP"); and (3) Impac's internal audit function did not provide adequate monitoring of controls. Id. In response to these problems, Impac announced in its Form 10–Q for the first quarter of 2005 that it had and would continue to implement staff and policy changes to remedy the internal control deficiencies. Id. at ¶ 8. Although Impac stated that it would undertake numerous

2. This motion is Defendants' second motion to dismiss. In an order dated September 19, 2007, the Court granted the prior motion to dismiss, finding that the original consolidated Complaint failed to meet the heightened pleading requirements of Rule 9(b) and the PSLRA. Specifically, the Court held that the Complaint (1) failed to allege any false statement; (2) improperly relied on the "group published" exception to Rule 9(b); (3) failed to allege sufficient facts to demonstrate scienter; (4) ignored the PSLRA's Safe Harbor as it applied to Mr. Tomkinson's statement regarding rate risk management; and (5) failed to properly allege control person liability under Section 20(a). See Order Granting Defs.' Mot. Dismiss, dated September 19, 2007.

remedial measures, the following five measures are the ones most relevant to this action. First, Impac asserted that it had hired new consultants to assist Impac's internal audit group in documenting Impac's accounting and business processes. *Id.* at ¶ 84. Second, Impac stated that the new consultants had worked with Impac's management team to establish new internal control processes to remedy any deficiencies. *Id.* Third, the company stated that it had instituted new control procedures around Impac's quarterly reporting processes for accounting for significant or complex transactions. *Id.* Fourth, Impac declared that it had hired additional resources in the accounting and finance areas with expertise in technical accounting and SEC reporting. *Id.* Fifth, Impac stated that it had begun implementing policies and procedures with respect to authorization and monitoring of user access and with respect to the authorization and documentation requirements for program changes in order to ensure the effectiveness of its IT general controls. *Id.* Plaintiffs allege that these statements were false when made because Defendants had no intention of undertaking these remedial measures and, in fact, prevented the newly-hired consultants from implementing these changes. *Id.* at ¶ 85.

On May 13, 2005, a few days before Impac announced that it would remedy its internal control problems, Impac issued a press release summarizing its "Financial Highlights for First Quarter 2005." (Defendants' Request for Judicial Notice ("RJN"), Ex. T, p. 217.)³ In the press release, Defendant Tomkinson stated that despite the challenges faced by the company, Impac "continue[d] to expect solid loan

acquisitions and originations." FAC, ¶ 79. Defendant Tomkinson repeated this sentiment during a May 16, 2005 conference call, when he stated that "we remain optimistic for continued solid loan production for 2006." FAC, ¶¶ 82–83. Plaintiffs contend that these statements were false when made because Defendants knew that Impac was not properly monitoring the quality of its loans. *Id.* at ¶ 83. Therefore, Plaintiffs conclude that Defendants must have known that Impac's new loans would be non-performing and could not have genuinely expected solid loan production. *Id.*

Plaintiffs argue that these allegedly false statements regarding loan production artificially inflated stock prices during the Class Period. *Id.* at ¶ 14. A few months later, on August 8, 2005, Impac announced a net loss of $55 million for the second quarter of 2005, resulting in economic losses to Plaintiffs of up to $8.34 per share. *Id.* at ¶ 132. Plaintiffs assert that Defendants caused their losses by fraudulently misleading shareholders through the false statements about Impac's loan acquisitions and its efforts to remedy the internal control problems. FAC, ¶ 2.

### III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir.1997). When evalu-

---

**3.** The Court takes judicial notice of the 22 documents submitted as exhibits to Defendants' Request for Judicial Notice ("RJN"). These documents reflect matters that are generally known within the jurisdiction of the

Court and are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See* FED.R.EVID. 201(b).

ating a Rule 12(b)(6) motion, the Court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Moyo v. Gomez,* 32 F.3d 1382, 1384 (9th Cir.1994). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929, 949 (2007). When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986).

■ In this action, Plaintiffs seek recovery under § 10(b) of the 1934 Securities Exchange Act, codified at 15 U.S.C. § 78j(b), and SEC Rule 10b–5. Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (West 2008). The SEC has adopted Rule 10b–5 to further enforce this section. That Rule provides:

It shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The basic elements of a claim under § 10(b) and Rule 10b–5 are: (1) a material misrepresentation or omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss causation; and (5) economic loss. *In re Daou Sys., Inc. Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir. 2005) (*"Daou"*).

Claims brought under § 10(b) involve fraud and misrepresentation, and as such, they must meet the particularity requirements set forth in Federal Rule of Civil Procedure 9(b). *See Semegen v. Weidner,* 780 F.2d 727, 729, 734–35 (9th Cir.1985). Thus, the circumstances alleged in the complaint constituting fraud or mistake must be stated with particularity. FED. R. CIV. P. 9(b). The PSLRA, passed in 1995, imposed further pleading burdens on plaintiffs pursuing § 10(b) claims. *See In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 977 (9th Cir.1999) (*"Silicon Graphics"*) ("... Congress generally intended to raise the pleading standards to eliminate abusive securities litigation.") The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Plaintiffs are also required to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *See Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir.2002) (*quoting* 15 U.S.C. § 78u–4(b)(2)) (emphasis added in *Gompper*). In the Ninth Circuit, this higher standard for scienter requires plaintiffs to plead facts that come closer to demonstrating actual intent, rather than merely motive and opportunity. *Silicon Graphics,* 183 F.3d at 974.

■ The Ninth Circuit has held that the higher standard for pleading scienter "naturally results in a stricter standard for pleading falsity." *Daou*, 411 F.3d at 1015. This is because " 'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir.2002) ("*Vantive*") (*quoting Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001)). Thus, in order to satisfy the PSLRA, the complaint must allege, with sufficient particularity, facts that raise a strong inference that the defendants made false or misleading statements either intentionally or with deliberate recklessness. *Daou*, 411 F.3d at 1015 (*citing Silicon Graphics*, 183 F.3d at 974). "It is not enough for [plaintiffs] to state facts giving rise to a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness." *Silicon Graphics*, 183 F.3d at 985.

■ The Supreme Court recently set forth three rules designed to aid district courts in determining whether a plaintiff bringing a § 10(b) action has made allegations of scienter sufficient to survive a Rule 12(b)(6) motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. ——, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). First, district courts must "accept all factual allegations in the complaint as true." *Id.* Second, courts must consider the complaint in its entirety to determine whether it has adequately stated a claim for relief. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* Third, in "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* This holding is consistent with the Ninth Circuit's instruction to "consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897.

In *Tellabs*, the Supreme Court also clarified the PSLRA's "strong inference" requirement. Building off of its conclusion that all reasonable inferences, including ones unfavorable to the plaintiff, must be considered in determining whether a complaint adequately alleges scienter, the Supreme Court held that the inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S.Ct. at 2510.[4] In adopting this standard, the Supreme Court observed that the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.' " *Id.* (*quoting Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir.2004)). In the wake of *Tellabs*, district courts are instructed to evaluate allegations of scienter in a § 10(b) action by answering the following question: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at

---

4. The Supreme Court's ruling results in a standard that is slightly more favorable to securities plaintiffs than previously applied by the Ninth Circuit. Prior to *Tellabs*, plaintiffs could only establish a strong inference if, taking all reasonable inferences from the allegations in the complaint, it was *more likely* than not that the defendants' conduct was fraudulent. *See Gompper*, 298 F.3d at 896–97. Under *Tellabs*, the allegations need only establish that the existence of fraud is *equally likely* as any innocent explanation. *Tellabs*, 127 S.Ct. at 2510. *But see id.* at 2516 (Alito, J., concurring in the judgment) (noting that the difference between these two standards "is unlikely to make any practical difference").

least as strong as any opposing inference?" *Id.* at 2511.

■ In short, Plaintiffs were required to allege, with particularity, sufficient facts to raise a strong inference that the statements made by Impac and its officers were actually false or misleading at the time they were made *and* that Impac and its officers acted with the requisite level of intent.

## IV. ANALYSIS

The FAC alleges three types of material misrepresentations or false statements. First, Plaintiffs assert that Defendants falsely stated in Impac's Form 10–Q for the first quarter of 2005 that they would implement numerous remedial measures to fix the Company's inadequate accounting controls and procedures. FAC, ¶¶ 54, 84– 85. Plaintiffs argue that these statements were false when made because Defendants had no intention of undertaking these measures and in fact prevented newly hired internal control consultants from implementing these measures. *Id.* at ¶ 85.

Second, Plaintiffs argue that Defendant Tomkinson's statements in the May 13, 2005 press release and during the May 16, 2005 conference call regarding future loan production were material misrepresentations. Plaintiffs challenge the following statements: "we continue to expect solid loan acquisitions and originations," "we remain optimistic for continued solid loan production for 2005," and "we continue to

believe our fundamentals are solid." [5] *Id.* at ¶¶ 79, 82. Plaintiffs allege that because Defendant Tomkinson knew that Impac was not properly monitoring the quality of its loans and that it was operating in a "do any deal" culture, Defendant Tomkinson must also have known that Impac's new loans would be non-performing. *Id.* at ¶ 83. Plaintiffs conclude that Defendant Tomkinson could not truly have expected "continued solid loan production." *Id.*

Third, Plaintiffs assert that the SOX certifications that were attached to the Forms 10–Q and 10–K/A for the first quarter of 2005 also contained false statements by Defendants Tomkinson and Johnson, since these two Defendants signed the certifications and verified that the attached Form 10–Q did not contain any untrue statements of material fact. *Id.* at ¶ 86. Because the attached Form 10–Q contained the allegedly false statements regarding the remedial measures, Plaintiffs argue that the SOX certifications are another source of misrepresentations. However, the SOX certifications are false only to the extent that the remedial measures statements within the Form 10–Q are false, so the Court need not consider the SOX certifications separately.[6] The Court need only analyze whether Plaintiffs have met the pleading requirements of the PSLRA and Rule 9(b) with respect to the statements regarding remedial measures and the statements regarding future loan production.

---

**5.** The statement "we remain optimistic for continued solid loan production for 2005" was made by Defendant Tomkinson during the May 16, 2005 conference call, but the conference call was hosted by both Defendants Tomkinson and Johnson.

**6.** Plaintiffs also point out that the SOX certifications stated that the certifying officers had "designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant . . . is made known

to us by others within those entities. . . ." FAC, ¶ 86. Plaintiffs argue that this statement is an assertion that "the Company's internal controls were adequate and reasonably effective" and therefore also qualifies as a false statement. Opp'n, p. 18. The Court disagrees. This portion of the SOX certifications only represented that the officers designed disclosure controls and procedures that ensured material information relating to Impac would be known to them.

## A. Plaintiffs Fail to Attribute Any False or Misleading Statements to Six of the Eight Individual Defendants

■ The first notable defect within the FAC is that Plaintiffs, once again, have failed to attribute any false or misleading statement whatsoever to six of the eight named Defendants. The PSLRA imposes a "specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the requisite state of mind.'" *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364 (5th Cir.2004) (*quoting* 15 U.S.C. § 78u–4(b)). Like the original Complaint, the FAC fails to allege that six of the eight individual Defendants (officers Ashmore, Verdugo and Morrison and outside directors Walsh, Fillips and Abrams) made any allegedly false or misleading statements. The allegedly false statements regarding the solid loan production were made by Defendant Tomkinson only. The only alleged misrepresentation that is not attributed to a particular speaker is the statement regarding the remediation efforts contained in the May 16, 2005 Form 10–Q. The certifications attached to the Form 10–Q were only signed by Defendants Tomkinson and Johnson.

■ Plaintiffs seek to invoke the "group published" exception to the particularity requirement under Rule 9(b) to contend that all eight individual Defendants are liable for the allegedly false statements pleaded in the FAC. FAC, ¶¶ 37–39, 119. In seeking to attribute Mr. Tomkinson's oral statements regarding solid loan acquisition to the other individual Defendants, Plaintiffs ignore the well-established rule that even under the "group published doctrine," oral statements cannot be attributed to a group. *See Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.Cal. 1998) (holding "group published" doctrine "does not apply to ... oral remarks of other individuals"). In arguing that the written statements within the Form 10–Q regarding remedial efforts can be attributed to all eight individual Defendants, Plaintiffs disregard the Court's previous admonishment that the "group published" exception has not survived the PSLRA. *See* September 19 Order. In the wake of the PSLRA, there has been significant disagreement between courts over whether the group pleading doctrine is still available. The two circuit courts to consider the question, as well as the majority of district courts within the Ninth Circuit, have concluded that group pleading is no longer viable under the PSLRA.[7] This Court agrees.

7. *See Southland Sec. Corp.*, 365 F.3d at 363–65; *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602–03 (7th Cir.2006), *vacated on other grounds*, 551 U.S. ——, 127 S.Ct. 2499, 2511 & n. 6, 168 L.Ed.2d 179 (2007); *In re Dura Pharms., Inc. Sec. Litig.*, 452 F.Supp.2d 1005, 1031 (S.D.Cal.2006); *In re Netopia, Inc. Sec. Litig.*, No. C–04–03364 RMW, 2005 WL 3445631 at *5 (N.D.Cal. Dec.15, 2005); *South Ferry LP # 2 v. Killinger*, 399 F.Supp.2d 1121, 1142 & n. 8 (W.D.Wash.2005); *In re Ligand Pharms., Inc. Sec. Litig.*, No. 04CV1620DMS(LSP), 2005 WL 2461151, at *15–16, 2005 U.S. Dist. LEXIS 44911, at *47–48 (S.D.Cal. Sept. 27, 2005); *In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1028–31 (S.D.Cal.2005); *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F.Supp.2d 1203, 1220–21 (S.D.Cal.2005); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F.Supp.2d 1149, 1171–72 (C.D.Cal.2004), *rev'd in part on other grounds*, 239 Fed.Appx. 318 (9th Cir. 2007); *In re Ashworth, Inc. Sec. Litig.*, No. 99CV0121–L(JAH), 2000 WL 33176041 at *12 (S.D.Cal.2000); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.Cal.1998). *But see In re Secure Computing Corp. Sec. Litig.*, 120 F.Supp.2d 810, 821–22 (N.D.Cal.2000); *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1104 (D.Nev.1998).

The PSLRA imposes a "specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the requisite state of mind.'" *Southland*, 365 F.3d at 364. "These PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate actions." *Id.* at 364–65. Plaintiffs in securities actions must distinguish among those they sue and identify with particularity the role each defendant played in the alleged fraud. *Id.* at 365. Accordingly, the *Southland* court wrote:

> [C]orporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement. Various unattributed statements within documents may be charged to different individuals, and specific facts may tie more than one individual to the same statement. And, the corporation itself may be treated as making press releases and public statements issued by

authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation. *Id.* at 365. Plaintiffs' complaint contains no specific factual allegations to link Defendants Ashmore, Verdugo, Morrison, Walsh, Fillips, and Abrams to any of the allegedly false statements. Without such allegations, Plaintiffs cannot plead a valid securities action against those defendants.

## B. Plaintiffs Have Failed to Identify Statements that are False or Misleading by Defendants Tomkinson and Johnson

In order to survive Defendants' motion to dismiss, the FAC must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Plaintiffs have failed to meet this standard because they have not alleged facts showing that either the remedial measures statements or the solid loan acquisition statements were false or misleading when made by Defendants Tomkinson and Johnson.

### 1. Remedial Measures Statements

Plaintiffs assert that Defendants Tomkinson and Johnson falsely stated in Impac's Form 10–Q from the first quarter of 2005 that they were implementing remedial measures to fix the Company's inadequate controls and procedures. FAC, ¶¶ 54, 84–85. Plaintiffs specifically attack the veracity of Defendants Tomkinson and Johnson's statements that Impac (1) hired outside consultants to assist Impac's internal audit group in documenting Impac's accounting and business processes and identifying areas that require control or process improvement; (2) established new

internal control processes based on discussions with Impac's consultants and management team in order to remedy any deficiencies; (3) instituted new control procedures around Impac's quarterly reporting processes for accounting for significant or complex transactions: (4) hired additional resources in the accounting and finance areas ·with expertise in technical accounting and SEC reporting; and (5) began implementation of policies and procedures with respect to authorization and monitoring of user access and with respect to the authorization and documentation requirements for program changes in order to ensure the effectiveness of these IT general controls. *Id.* at ¶ 84.

Plaintiffs allege that, in fact, the reality was quite the opposite; Impac had no intention of implementing meaningful changes to its internal control processes. Plaintiffs support these contentions of falsity with anonymous statements made by former employees.[8] For example, Former Employee 1 ("FE1") claims that Impac's audit department was comprised of "unqualified people" who were "uncooperative" and failed to provide FE1 with proper access to perform independent testing. FAC, ¶ 58. FE2 alleges that Impac managers refused to let him implement his suggested changes to the developmental lifecycle process for software packages. *Id.* at ¶ 60. FE5 contends that Impac managers refused to follow his recommendations regarding a SOX compliance policy and rewrote the policies that he had been hired to write. *Id.* at ¶ 70. FE8, who was hired to assist in the preparation of the Form 10–Q for the second quarter of 2005,

asserts that although Impac told him it would hire other people with SEC reporting experience to assist him, he was the "only SEC guy in the building." *Id.* at ¶ 73. FE8 also contends that he observed Defendants Verdugo and Johnson making last minute changes to the Form 10–Q. *Id.* at ¶ 74.

 The FEs' assertions can be boiled down to three main contentions: Defendants Tomkinson and Johnson severely hindered the FEs' ability to implement their recommended changes, failed to hire the promised additional resources, and made last minute changes to SEC filings without review by Impac's Audit Committee. Pls.' Opp'n Defs.' Mot. Dismiss ("Opp'n"), p. 18. Presuming these allegations are true, they establish that Impac's management team exhibited poor judgment, stubbornness, arrogance, and perhaps even incompetence. However, because these allegations do not show any deceit on the part of Defendants Tomkinson and Johnson, they cannot support a fraud claim. Federal securities laws do not create a cause of action for corporate mismanagement that is not accompanied by deception. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

In *Santa Fe Industries, Inc. v. Green,* the plaintiffs asserted claims under Section 10(b) and Rule 10b–5 because the defendants failed to give them advance notice of a short-form merger, among other grounds. *Id.* at 467, 97 S.Ct. 1292. The Supreme Court framed the issue before it as whether Section 10(b) was intended to prohibit conduct that might constitute a

---

8. The Ninth Circuit has held that when evaluating whether a complaint satisfies the PSLRA's standard of particularity, courts may consider statements made by confidential witnesses provided that the witnesses' allegations are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Daou,* 411 F.3d at 1015 (citations omitted). Here, the FEs' allegations are made with sufficient particularity to be considered by the Court, but they do not demonstrate that Plaintiffs have met the requirements of the PSLRA because the allegations do not show falsity or scienter.

breach of fiduciary duty or corporate mismanagement but did not involve manipulation or deception. *Id.* at 473, 97 S.Ct. 1292. The Court concluded that fraud claims only state a cause of action under Section 10(b) or Rule 10b–5 if the conduct can fairly be viewed as "manipulative or deceptive" within the meaning of the statute. *Id.* at 473–74, 97 S.Ct. 1292. The Court held that corporate mismanagement or other violations of fiduciary duty by corporate officers, when not accomplished through deception, should be regulated by state rather than federal securities law. *Id.* at 478, 97 S.Ct. 1292. The Court concluded that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Id.* at 479, 97 S.Ct. 1292. Here, the FEs' statements may indicate that Impac engaged in corporate mismanagement, but they in no way demonstrate that Defendants Tomkinson and Johnson engaged in deception or manipulation when making the remedial statements, and thus are not actionable under Section 10(b).

For example, the allegations of FE1 and FE2 that Impac's management was "uncooperative" and refused to implement the FEs' suggested changes do not contradict Defendants Tomkinson and Johnson's statement that Impac would establish new internal control procedures for accounting—they just show that Impac's management team did not establish the processes in the manner recommended by the FEs. With respect to new hires, Defendants Tomkinson and Johnson stated that Impac would hire outside consultants to document its accounting processes and to identify areas that required control or process improvement. By Plaintiffs' own admission, Impac hired FE1 and FE2 for this very purpose. Defendants Tomkinson and Johnson also promised that Impac would hire additional resources with expertise in accounting and SEC reporting, and Impac made good on this promise by hiring FE5, a "technical writer specializing in SOX compliance." Plaintiffs do not contest Defendants Tomkinson and Johnson's statement that Impac hired a new Director of Internal Audit, Controller, Chief Accounting Officer, and a Tax Manager in order to remedy the internal control deficits. (RJN, Ex. C, p. 81.) Defendants Tomkinson and Johnson never promised that Impac would hire a specific number of new consultants, or that it would adhere to the demands of new consultants regarding how many staff members were needed to assist the company.

Moreover, FE8's contention that Defendants Verdugo and Johnson made last minute changes to the Form 10–Q in no way contradicts Defendants Tomkinson and Johnson's promise to implement staff and policy changes to correct internal control deficiencies. As Defendants note in their reply brief, there is no rule or regulation requiring Impac to obtain Audit Committee approval before every single change to a Form 10–Q. Defs.' Reply, p. 3 & n. 6. Even if this allegation shows that Impac's management was operating in "a chaotic environment," as Plaintiffs contend, it falls short of establishing that Defendants Tomkinson and Johnson never intended to implement the remedial measures to rectify Impac's internal control problems.

Finally, it is undisputed that Impac was ultimately successful in remediating its internal control and operations deficiencies, further undermining Plaintiffs' assertion that Defendants Tomkinson and Johnson's statements regarding remedial measures statements were false when made.[9] Put

---

**9.** The Ernst & Young LLP auditor's report submitted by Defendants indicates that Impac had remediated its internal controls four months after the end of the Class Period, by

simply, presuming Plaintiffs' allegations are true, they may support the view that Defendants Tomkinson and Johnson have engaged in corporate mismanagement, but they do not indicate that these Defendants should be held liable for lying about Impac's remediation efforts.

### 2. Solid Loan Acquisition Statements

 The second category of purportedly false or misleading statements consists of comments made by Defendant Tomkinson in the May 13, 2005 press release and during the May 16, 2005 conference call. The statements, which all pertain to future loan production and expectations, are as follows: "We continue to expect solid loan acquisitions and originations"; "We remain optimistic for continued solid loan production for 2005"; and "We continue to believe our fundamentals are solid." FAC at ¶¶ 79, 82. Plaintiffs argue that because Defendant Tomkinson knew that Impac was not properly monitoring the quality of its loans and that it was operating in a "do any deal" culture, he must also have known that Impac's new loans would be non-performing. *Id.* at ¶ 83. Therefore, Defendant Tomkinson could not truly have expected "continued solid loan production," the argument continues. *Id.* Plaintiffs' theory is unavailing for two reasons. First, the solid loan acquisition statements are mere puffery and are not actionable as material misrepresentations. Second, the statements are protected by the Safe Harbor of the PSLRA.

The solid loan acquisition statements are essentially statements of corporate optimism. Various circuit courts, including the Ninth Circuit, have held that vague, generalized assertions of corporate optimism or statements of "mere puffing" are not actionable material misrepresentations under federal securities laws. *See Glen*

*Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 379 (9th Cir.2003); *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir.1997); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,* 387 F.3d 468, 489 (6th Cir.2004); *Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir.2004). Statements of "mere puffing" are forward-looking statements of optimism that are "not capable of objective verification" and "lack a standard against which a reasonable investor could expect them to be pegged." *See Grossman,* 120 F.3d at 1119; *Bridgestone,* 387 F.3d at 489.

In stating that he "continue[d] to expect solid loan acquisitions and originations," Defendant Tomkinson was making a forward-looking statement of optimism regarding loan production. Because such a statement is not capable of objective verification, it is properly characterized as a statement of "mere puffing." *Id.* In the case *In re Splash Technology Holdings, Inc. Securities Litigation ("Splash"),* the court held that statements strikingly similar to those made by Defendant Tomkinson were merely "puffing statements" and therefore not actionable. 160 F.Supp.2d 1059, 1076–77 (N.D.Cal.2001). Specifically, the plaintiffs challenged the defendants' statements (1) about Splash's "strong" demand; (2) that Splash's results were "better than expected," or "robust"; (3) that Splash's growth strategy was "unfolding as planned"; and (4) that Splash's position was "solid," among others. *Id.* at 1076. The court stated that when determining whether general expressions of optimism are actionable, the defining question is "whether the statement is so 'exaggerated' or 'vague' that no reasonable investor would rely on it when considering the total mix of available information." *Id.* (*quoting Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 200 (3d Cir.1990)). The

December 31, 2005. (RJN, Ex. Q, pp. 195–95.)

court held that phrases such as "strong," "better than expected," "robust," "well-positioned," "solid," and "improved," when used to describe demand, results, and growth strategy, were not actionable as material misrepresentations. *Id.* at 1077. Instead, such statements were generally hyperbole and did not convey a false or misleading impression of the future on which a reasonable investor would rely. *Id.*

Like the defendants in *Splash*, Defendant Tomkinson was employing hyperbole in using the word "solid" to characterize Impac's fundamentals, loan acquisitions and originations. As the *Splash* court recognized, the word "solid," like the words "robust" and "strong," is such a vague expression of optimism that it would not have conveyed a misleading impression of the future on which a reasonable investor would rely.[10]

The Ninth Circuit has also concluded that vague, optimistic statements similar to those made by Defendant Tomkinson may not be actionable as material misrepresentations. *See Vantive*, 283 F.3d at 1086–87. The Ninth Circuit held that such statements do not meet the heightened pleading standard of the PSLRA unless plaintiffs can provide specific allegations defining the objectionable term and thereby showing it was false when made. *Id.* In *Vantive*, the plaintiffs challenged the defendants' statement that the growth and performance of its direct sales force was "on plan," when in fact the defendants were unable to hire or train a sufficient number of persons. *Id.* at 1086. The plaintiffs also objected to the defendants' statement that they had an "extremely strong" sales management team. *Id.* The court found that neither the description "on plan" nor the phrase "extremely strong" was an actionable misrepresentation. *Id.* at 1086–87. The court explained that the phrase "on plan" to describe the growth of the sales force was not actionable without specific allegations showing what time frame the defendants were referring to when they made the statement, what the defendants meant when they said they would have a sufficient number of hires, or what the defendants meant when they said new hires would have adequate training. *Id.* Likewise, the complaint failed to define what it would mean for a management team to be "extremely strong." *Id.* at 1087. The court concluded, "[i]n the absence of greater particularity, we have no way of distinguishing the plaintiff's allegations from the countless 'fishing expeditions' which the PSLRA was designed to deter." *Id.* (internal citations and quotations omitted).

Applying the *Vantive* analysis to the facts of this case, the word "solid," when used to describe loan origination and acquisition, is too vague to be actionable without allegations showing what Defendant Tomkinson meant in using that term. Plaintiffs cannot point to any accompanying statements specifying the number of loans to be acquired or originated because Defendant Tomkinson made no such specific promises. Instead, his optimistic

---

10. *See also In re Calpine Corp. Sec. Litig.*, 288 F.Supp.2d 1054, 1088 (N.D.Cal.2003) (finding "strong" and "solid" to be "far too vague to be actionable under the PSLRA"); *In re Copper Mountain Sec. Litig.*, 311 F.Supp.2d 857, 880 (N.D.Cal.2004) (concluding that "characterizations of businesses as 'solid' and 'on track' are best characterized as inactionable puffery"); *In re Cornerstone Propane Partners,* *L.P. Sec. Litig.*, 355 F.Supp.2d 1069, 1087–88 (N.D.Cal.2005) (finding that CEO's statements describing "record achievements" and attributing company's accomplishments to "continuing improvements in operations and increased cash flows from acquisitions and internal growth" were "mere puffing" because they are "not capable of objective verification.")

statements were mere puffery upon which a reasonable investor could not rely.

■ In addition to the fact that the statements regarding loan production are too vague to be actionable, they are protected by the PSLRA's Safe Harbor for forward-looking statements. *See* 15 U.S.C. § 78u–5(c). A forward looking statement is defined as a statement containing a projection of revenues, income, earnings per share, management's plans or objectives for future operations, or a prediction of future economic performance. 15 U.S.C. § 78u–5(i)(1)(A)–(C). In addition, any statement of "the assumptions underlying or relating to" these sorts of statements fall within the meaning of a forward-looking statement. 15 U.S.C. § 78u–5(i)(D). Because Impac's future income was dependent on loan production, these statements, which predicted increased loan production, qualify as "a prediction of future economic performance." Accordingly, these statements are "forward-looking" within the meaning of the PSLRA. *See also In re LeapFrog Enters., Inc. Sec. Litig.,* 527 F.Supp.2d 1033, 1046 (N.D.Cal.2007) ("[A] statement predicting the company's future expected sales or other financial results" falls squarely within the PSLRA's Safe Harbor protection.)

The Safe Harbor applies if the forward-looking statement is either identified as such and accompanied by meaningful cautionary language or was made without actual knowledge of its falsity. 15 U.S.C. § 78u–5(c)(1)(A); *see also Lockheed,* 272 F.Supp.2d at 949. Because the two prongs of the Safe Harbor are "alternative means by which forward-looking statements may qualify for the safe harbor," a defendant need only establish that it meets one of the prongs to be protected by the Safe Harbor. *Splash,* 160 F.Supp.2d at 1071. These statements are protected under either ground for Safe Harbor. Within the May 13, 2005 press release, Impac included cautionary language under a section entitled "Forward–Looking Statements." That section contained language indicating that actual financial results might differ from the forward-looking statements within the press release. Forward-looking statements were identified as those with accompanying words such as "should," "expect," or "anticipate." (RJN, Ex. T, p. 220.) The "Forward–Looking Statements" section identified several risks that could cause actual results to differ, such as delays in raising capital, market conditions, interest rate fluctuations, and *risks related to Impac's ability to maintain an effective system of internal control over financial reporting and disclosure controls and procedures due to reported material weaknesses. (Id.)* This section of the press release also pointed shareholders to the "Risk Factors" section of the Form 10Q, which contained another cautionary section entitled "We face risks related to our recent accounting statements." (RJN, Ex. F., p. 106.) This section contained the following statements:

**Since we are reporting in this annual report and may report in the future that our system of internal controls over financial reporting and disclosure controls and procedures are ineffective, we may not be able to accurately report our financial results or prevent fraud, which could adversely affect the trading price of our securities or our ability to raise capital.**

*(Id.* at p. 107) (emphasis in original).

The first ground for Safe Harbor also applies to Defendant Tomkinson's statements during the May 16, 2005 conference call. At the beginning of the call, Tania Jerigan, a Vice President at Impac, warned listeners that the conference call participants would make forward-looking statements regarding loan acquisitions and originations, but that actual results might

differ materially from these statements. (RJN, Ex. T, p. 222.) Ms. Jerigan referred listeners to the business risk factors contained in the Form 10–Q for the period of March 31, 2005 as well as the form 10–K/A for 2004. (*Id.*) Both within the press release and during the conference call, Impac used meaningful language that specifically cautioned shareholders that Defendant Tomkinson's statements were forward-looking and that their predictive value was undermined by the fact that Impac had not fully remedied the problems within its internal control system. In light of such language, Defendant Tomkinson's statements are protected under the first ground for Safe Harbor.

Equally problematic for Plaintiffs, however, is the fact that Defendant Tomkinson's statements also meet the second ground for Safe Harbor because Plaintiffs have not pled that the statements were made with actual knowledge of their falsity. As will be more fully explained in the Court's discussion of scienter, *infra*, Part C, Plaintiffs have not alleged facts to support a strong inference that Defendant Tomkinson knew that Impac could not reasonably expect solid loan acquisitions or remain optimistic for continued solid loan production.

### C. Plaintiffs Have Failed to Allege Facts Supporting Scienter

Even if Plaintiffs were able to state facts demonstrating that Defendants Tomkinson and Johnson's statements were false when made, the FAC also must be dismissed because it fails to meet the heightened standard for pleading scienter under the PSLRA.

### 1. Remedial Measures Statements

Plaintiffs are required to state with particularity facts giving rise to a strong inference that each Defendant acted with the requisite state of mind. 15 U.S.C. § 78u–4(b)(2). Specifically, the complaint must

establish a strong inference that each Defendant made a false or misleading statement with knowledge that the statement was false or recklessly disregarding that it was false at the time the statement was made. *See Silicon Graphics*, 183 F.3d at 979. With respect to the remedial measures statements, Plaintiffs argue that scienter should be inferred from the FEs' statements and Defendants Tomkinson and Johnson's access to unidentified reports. Specifically, Plaintiffs argue that because some of the FEs who were hired to help implement the remedial measures reported directly to certain of the individual Defendants on a weekly basis, Defendants Tomkinson and Johnson must have known that the remedial measures statements were false when made. Opp'n, p. 26; FAC, ¶ 75.

■■■ This argument is misguided because it fails to establish any connection between the FEs' contentions and Defendants Tomkinson and Johnson's knowledge and intent at the time they made the remedial measures statements. The FAC does not allege that any of the FEs had any specific discussion with either Defendant Tomkinson or Johnson alerting these Defendants that the remedial measures were an abject failure, or even notifying them that Impac's management team was preventing the FEs from implementing necessary changes. Even if the FEs had communicated their frustration regarding the remediation process to the individual Defendants, it does not follow that Defendants Tomkinson and Johnson knew their statement that Impac was implementing remedial efforts was false when made. As discussed above, the remedial measures statements were not promises to follow every recommendation of the newly hired consultants (i.e. the FEs); they were merely promises to implement policy changes and to hire new staff members to assist in that process. The fact that the

FEs were frustrated with the method of implementing these policy changes and that they had some direct contact with Defendants Tomkinson and Johnson does not raise a strong inference that these Defendants knew their statements were false when made or that they made misleading statements with deliberate recklessness.

Additionally, Plaintiffs' assertion that Defendants Tomkinson and Johnson received "spreadsheets and reports about the Company's performance" on a weekly basis is insufficient to support an inference of scienter. Vague references to "packages" and "reports" are the type of boilerplate allegations that courts generally reject as evidence of scienter. *See Silicon Graphics*, 183 F.3d at 985 (if a complaint "purports to rely on the existence of internal reports, [it must] contain at least some specifics from those reports as well as such facts that may indicate their reliability"); *In re Lockheed Martin Corp. Securities Litigation*, 272 F.Supp.2d 944, 956 (C.D.Cal.2003) (holding allegations that defendant "received regular updates regarding the status of the Company's major projects" were insufficient to allege scienter).

### 2. Solid Loan Acquisition Statements

■ Plaintiffs argue that Defendant Tomkinson acted with deliberate recklessness in making the solid loan acquisition statements because he knew that Impac was operating in a "do any deal" culture,

the internal control policies prevented Impac from monitoring the quality of its loans, and Impac's loan quality was deteriorating.[11] Opp'n, pp. 27–28. There are several problems with this argument. Even if Defendant Tomkinson was aware that Impac was taking on increasingly risky loans, this fact does not establish that he was being deceitful in stating that he anticipated solid loan acquisition. To the contrary, if Impac indeed intended to grow production in the Alt–A segment and to expand into the even riskier Alt–B loan market, as Plaintiffs contend (*see* FAC, ¶ 62), then Defendant Tomkinson reasonably should have expected "solid loan acquisitions and originations" and "solid loan production for 2005." Plaintiffs own assertions contradict and undermine their allegations of scienter, in that they state "[a]t the end of 2004, Impac had grown production in the Alt–A segment by 139% as compared to 2003." *Id.* Plaintiffs apparently confuse Defendant Tomkinson's statements about the *quantity* of future loans for a statement about the *quality* of those loans. In any event, the fact that Impac was operating in a fast-paced business environment in which it took on riskier clients does not raise an inference that Defendant Tomkinson knew his statements regarding loan acquisition were false when made.

Plaintiffs' argument that Defendant Tomkinson must have known his statements were false when made because of the internal control problems faced by Impac also fails to raise an inference of

---

**11.** Plaintiffs make the additional argument that scienter can be inferred from Defendants' insider trading. Courts consider three factors in determining whether insider stock sales are suspicious: (1) the amount and percentages of shares sold by the insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insiders' prior trading history. *Silicon Graphics*, 183 F.3d at 986. Here, neither Defendant Tomkinson nor John-

son engaged in trading that can be fairly characterized as "suspicious," much less which raises a strong inference of scienter. Defendant Tomkinson did not sell any shares during the Class Period, but increased his ownership by exercising options and holding the stock. (RJN, Ex. U.) Defendant Johnson increased the number of shares owned by 620 during the Class Period. (RJN, Exs.J–P.)

scienter. Plaintiffs argue that the internal control problems prevented Impac from verifying the income of borrowers of Alt–A mortgage loans. FAC, ¶ 65. Yet Alt–A mortgages, by definition, are loans made to borrowers who lack certain documentation or verification of income and assets. (RJN, Ex. G, pp. 136, 138.) Moreover, the problems with the internal controls pertained mainly to Impac's ability to properly account for and report on underlying transactions, not to the underwriting criteria Impac used for making loans or whether the borrowers had the ability to repay the loans. *See* 17 C.F.R. § 240.13a–15(f) (defining "internal control over financial reporting" as "a process ... to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"). The FAC fails miserably in explaining how Impac's internal control problems could have undermined Impac's loan acquisitions and originations. This failure leads to the strong inference that, rather than being causally linked, Impac's internal control problems actually bore no relation to Impac's loan acquisitions.

■ The Supreme Court in *Tellabs* instructed district courts to evaluate allegations of scienter in a § 10(b) action by answering the following question: "When the allegations are accepted as true and taken collectively, would a reasonable per-son deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 127 S.Ct. at 2511. Considering the allegations collectively and in their totality, the Court also concludes that Plaintiffs' FAC fails to raise the requisite inference of scienter. Most significant is Plaintiffs' failure to adequately plead that any of the alleged false statements were known to be false when they were made. Although the FAC contains voluminous conclusory allegations regarding Defendants Tomkinson and Johnson's knowledge or deliberate recklessness, none of the allegations show that they were notified of information that would have led them to believe that any of the challenged statements were false when made. Plaintiffs' FAC essentially boils down to: (1) Impac admitted that its internal control policies and procedures were deficient; (2) Impac announced that it would undertake efforts to remedy those internal control deficiencies; (3) Impac did not completely follow the recommendations of outside consultants hired to remedy the deficiencies; and (4) Impac did not perform as well as suggested by its CEO's forward-looking statements. This is not an actionable claim under the PSLRA. "Calling executives bad managers, or bad forecasters, does not plead fraud, except where it can be shown that they knew or were deliberately reckless in disregarding the misleading nature of their forecasts." *Ronconi*, 253 F.3d at 437.[12]

---

**12.** Because Plaintiffs have not properly alleged that the individual Defendants Tomkinson and Johnson acted with the requisite state of mind, they also have failed to plead corporate scienter. A corporation cannot act without human agents, and therefore "a defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement." *In re Apple Com-puter, Inc. Sec. Litig.*, 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002), *aff'd*, 127 Fed.Appx. 296 (9th Cir.2005) *(citing Nordstrom, Inc.v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435–36 (9th Cir. 1995)). Having concluded that Plaintiffs have not stated a valid § 10(b) claim, the Court also finds that Plaintiffs have failed to state a claim under Section 20(a), 15 U.S.C. § 78t(a) (the second cause of action within the FAC). In order to plead control person liability, Plaintiffs must allege a primary violation of Section 10(b). *Heliotrope*, 189 F.3d at 978. Additionally, the Section 20(a) claim is defi-

## V. CONCLUSION

The FAC suffers from at least two fatal defects.[13] First, it does not plead with particularity that the challenged statements made by Defendants Tomkinson and Johnson were actually false or misleading when made. Second, it fails to allege sufficient facts to establish that these Defendants acted with the requisite scienter when they made these statements. The Court finds that it must dismiss this action with prejudice. Plaintiffs have demonstrated that they are unable to correct the deficiencies within the original Complaint, and the Court has no reason to believe that Plaintiffs would be able to remedy these material defects if they were given a third bite at the apple. Additionally, dismissal with prejudice is necessary to promote the goal of the PSLRA, which is to "raise the pleading standards to eliminate abusive securities litigation." *Silicon Graphics*, 183 F.3d at 977.

cient because Plaintiffs have failed to adequately allege, with particularity, that each Defendant possessed "a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1277 (N.D.Cal.2000). Generalized allegations that Defendants Tomkinson and Johnson had direct and supervisory control over Impac's day-to-day operations are insufficient to meet this standard.

13. Defendants also point to another crucial shortcoming of the FAC—the failure to properly plead loss causation. The Court agrees that Plaintiffs did not properly plead that cor-

rective disclosures deflated the allegedly fraudulently inflated stock price, causing the price to drop and resulting in losses to investors who purchased at the inflated price. 15 U.S.C. § 78u–4(b)(4). While Plaintiffs point to a drop in stock price on August 9, 2005 (the loss), they have failed to plead facts showing that this decline in price was the direct result of any corrective disclosures pertaining to Defendants Tomkinson and Johnson's statements regarding remedial measures or solid loan acquisition. The August 9, 2005 second quarter Form 10–Q contained no corrective statement, but rather repeated the alleged misrepresentations. (RJN, Ex. C, p. 81.)