## In re COOPER SECURITIES LITIGATION.

### Case No. SACV06–00169–CJC(RNBx).

United States District Court,
C.D. California,
Southern Division.

March 4, 2010.

Darren J. Robbins, Darryl James Alvarado, Lauren G. Kerkhoff, Maureen E. Mueller, Ryan A. Llorens, X Jay Alvarez, Robbins Geller Rudman & Dowd LLP, William S. Lerach, Coughlin Stoia Geller Rudman and Robbins, San Diego, CA, Eben O. McNair, IV, Schwarzwald and McNair, Cleveland, OH, for Plaintiffs.

Charles W. Cox, II, Michele D. Johnson, Michelle J. Correll, Ryan Darren White, Latham & Watkins, Bruce G. Vanyo, Katten Muchin, Geoffrey A. Graber, Morrison & Foerster, Los Angeles, CA, David M. Brodsky, John Shin, Latham and Watkins, New York, NY, Paul H. Dawes, Latham & Watkins LLP, Menlo Park, CA, Mark R. S. Foster, Stacey M. Sprenkel, Jordan Eth, Judson E. Lobdell, Gregory Andrew Call, Morrison and Foerster, San Francisco, CA, for Defendants.

Michiyo M. Furukawa, Milberg LLP, Timothy J. Burke, Stull Stull & Brody, Los Angeles, CA, for Movants.

## ORDER DENYING IN SUBSTANTIAL PART MOTION FOR SUMMARY JUDGMENT

CORMAC J. CARNEY, District Judge.

### INTRODUCTION

This case is a securities litigation involving the Cooper Companies ("Cooper"), a contact lens company, its individual officers and investors. Plaintiffs allege that both before and after Cooper acquired Ocular Sciences, Inc. ("Ocular") in January of 2005, Cooper's officers made several false statements to conceal problems that would affect its stock price. Plaintiffs allege that three categories of statements were false, namely, (1) statements concerning Ocular's inventory strategy; (2) statements concerning Ocular and Cooper's sales force integration; and (3) statements concerning the threat to Cooper's business by Silicone Hydrogel lenses produced by competitors. Both Cooper and the individual officers move for summary judgment as to all claims. For the following reasons,

the motion is DENIED in substantial part.[1]

## BACKGROUND

Cooper develops, manufactures and markets healthcare products through two subsidiaries, CooperSurgical and CooperVision. (Pl.'s Corrected Response to Def.'s Stmt of Uncontroverted Facts ("Resp. UF") No. 1.) CooperVision, which is the subsidiary at issue in this matter, is responsible for developing, manufacturing and marketing contact lenses. (Resp. UF No. 2.)

In 2004–05, which is the current class period, there were essentially two major segments dominating the contact lens market. (Resp. UF No. 3.) The first was a spherical segment and the second a specialty segment. (Resp. UF No. 3.) As noted by Defendants, the market was divided into three geographic regions: the United States, Europe and Asia/Japan. This litigation involves competition in the spherical market in the United States. In 2004, there were several major competitors in the spherical market offering varied products: Bausch & Lomb ("B & L"), CIBA Vision ("CIBA"), Johnson & Johnson, CooperVision and Ocular Sciences. (Resp. UF No. 13.)

In 1999, B & L launched Pure Vision, a silicone hydrogel lens that was marketed as a continuous-wear lens that could be worn continuously for 30 days and 30 nights. (Resp. UF No. 18.) Silicone hydrogel has a higher DK—or oxygen permeability—than standard hydrogel lenses. (Resp. UF No. 19.) Also in 1999, CIBA launched Focus Night & Day, which was also a continuous wear lens made out of silicone hydrogel. (Resp. UF No. 23.) As B & L and CIBA were marketing the silicone hydrogel lenses, Cooper acquired the Proclear line of lenses, a non-silicone hydrogel lens, in 2002. (Resp. UF No. 26.) The Proclear lens is the only lens with FDA approval for the claim that the lens "may provide improved comfort for contact lens wearers who experience mild discomfort or symptoms relating to dryness during lens wear." (Resp. UF No. 27.) Johnson & Johnson also competed in the U.S. spherical market with three products: Acuvue, Acuvue II and Acuvue Advance. Johnson & Johnson launched Advance in approximately December 2003, which was the first silicone hydrogel lens marketed for daily wear. (Resp. UF No. 29.) In contrast, Ocular competed in the spherical market with Biomedics 55, a non-silicone lens, which was launched at some point prior to the class period. (Resp. UF Nos. 15 and 16.) Ocular also developed a premium lens called Biomedics Premier in early 2004, which Defendants assert was marketed as a replacement to the Biomedics 55. (Def. Mem. In Support of Cooper Companies at 4.)

On May 4, 2004, Ocular held a conference call in which Ocular's Chairman, John Fruth, stated that "[w]e give up the upside of inventory build in the market place, and we're feeling a little bit of that right now as customers are taking their inventories down." (Resp. UF 47.) Additionally, on May 10, 2004, Ocular filed its quarterly 10–Q with the SEC. (Resp. UF 48.) Ocular stated that a decrease in U.S. sales was "primarily due to a continued decline in sales of our conventional reusable product line and lower sales of disposable spheres as we believe customers began reducing their inventories in advance of our second quarter launch of a new sphere product." (Resp. UF No. 48.)

---

1. Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. See FED.R.CIV.P. 78; LOCAL RULE 7–

15. Accordingly, the hearing set for March 8, 2010 at 1:30 p.m. is hereby vacated and off calendar.

On July 28, 2004, the Cooper Board of Directors approved a proposed merger with Ocular. (Resp. UF No. 52.) Cooper released a press release the same day announcing the proposed merger. (Resp. UF No. 54.) Also that same day, Ocular issued a press release that stated: "The Company's growth rate in 2004 is based upon the experience in the second quarter with customers managing down their existing inventories in advance of the aspheric Biomedics 55 Premier launch." (Resp. UF No. 53.) On July 29, 2004, Cooper and Ocular hosted a joint conference call to discuss the merger. (Resp. UF 55.) Toward the end of the call, Ted Huber, an industry analyst with Wachovia, asked John Fruth the following question:

> John, I'm less familiar with your guys kind of pipeline and forecast, but one thing I did pick up, just looking at the numbers, was you grew about 5% constant currency in the first half of this year, and the consensus revenue estimates for you all, for Ocular, for '05 and '06, and I think in this guidance here, as well, you're giving us, it's kind of more in the 10%, 11% range. Can you just characterize where that acceleration comes from in the business?

Mr. Fruth responded as follows:

> Well, I think that if you look at where Ocular is today, we've got a pipeline of products that are just coming. We mentioned some of them in Japan. We just launched the Aspheric weekly disposable in the U.S. It's getting great reception. A multifocal coming, as well as another two-week disposable product; the U.S., we are just starting to launch daily disposables; and we got the silicone hydrogel coming next year. So the growth side of it is coming from a new product pipeline that gives us a real opportunity to participate in new markets as well.

After Mr. Fruth finished his answer, Cooper's President and CEO, A. Thomas Bender, added his thoughts:

> I can answer it even another way. If you look at Ocular's performance, I think you'll flash on very quickly that their international business is growing very well. A lot of that is Japan as well as in Europe. Where they're getting hurt is in the U.S., as we see that. But remember what Ocular used to be—Ocular was a commodity disposable [sphere] business, and there's no doubt we're kicking their butt a little bit and Advantage was, you know, Acuvue Advantage was hurting them a little bit, and they were a little slow, and they've done very well with their new specialty products, but what they really did in the last six months, I think, has been very smart, and that is they moved their new product, which is—it's a premier-designed [sphere]. It's not what I would call a commodity, and what they're trying to do is move those patients that are on the old Bio Medics product into this better product. To do that effectively, they took a step back, and it's hurt their sales this year, because they sure as hell didn't have a 5% constant currency last year. With the strategy that they said they would do so they wouldn't have a lot of overlap inventory. So what they did is they allowed that inventory of the old product to decline as they built this new product in. So we looked at that pretty strongly, too, to make sure we didn't have a hurt hunter, here—somebody's lost a leg. They haven't lost a leg, it was part of their strategy.

(Resp. UF No. 56, 58–59.)

On August 6, 2004, Ocular filed its quarterly Form 10–Q for the second quarter. (Resp. UF No. 63.) Ocular attributed a .3% second quarter increase, and a 1.5% first-half decrease, in U.S. Sales to, in

part, "lower sales of disposable spheres as we believe customers are reducing their inventories of our older sphere product as a result of our launch of our new sphere product." (Resp. UF No. 63.) On September 30, 2004, Ocular's CEO, Steven Fanning, spoke at a UBS Global Life Sciences Conference. (Resp. UF No. 64.) As to replacing Biomedics 55 with Biomedics Premier, Mr. Fanning noted: "We're in the process in the second and third quarter in the U.S. of launching this product. We are replacing our spherical product, our original spherical product, with this product. Consequently, many of our retailers are basically taking down their inventories to prepare for this launch. We did that in the second quarter with many retailers." (Resp. UF No. 64.) On November 9, 2004, Ocular filed its form 10–Q for the quarter ending September 30, 2004. Ocular reported that "U.S. sales were $36.0 million and $100.7 million for the three and nine months ended September 30, 2004, a 1.1% increase and 0.6% decrease over the same periods last year, respectively. These results are primarily due to a continued decline in the sales of our conventional reusable product line and lower sales of disposable spheres as we believe customers are reducing their inventories of our older sphere product as a result of our launch of our new sphere product, offset by growth in sales of disposable toric lenses." (Resp. UF No. 65.)

On December 13, 2004, Cooper hosted a quarterly conference call for the fourth quarter. (Resp. UF No. 69.) Mr. Bender had the following exchange with a business analyst:

Q: On the market, certainly Bausch did put up a weaker U.S. number and Ocular did as well, but relatively Ocular actually grew faster than they had I believe in 3Q than they had earlier in the year.

A: That's right.

Q: So they didn't actually—you could actually argue that they did better in Q3 than the first part of the year, so there's no impact on the weather. And Bausch did have a tough comp relative to the first half of the year. And J & J was weak, but they were still up 13 percent. Was J & J mostly all price (ph) then?

A: ... As far as Ocular is concerned, remember Ocular in the first 2 quarters of this year purposely held back on distribution of their Biomedics so they could manage their inventories down. So that was a little bit manipulating too. So again, I'm not trying to make excuses. A fact is a fact ....

Mr. Bender was also asked to comment on the import of new hydrogel technologies. He responded with the following statement:

[S]ilicon hydrogel is a nice feature story. It is much like our Proclear line in 1 way in that they do address a definite need, and that need is there are patients who have developed or will develop what we call afternoon dryness after they have worn lenses for a period of time ... And Proclear has been a product that has certainly fit that need. The silicones are somewhat positioned in the same place....

I believe it's going to be a niche product line. They're not going to—there are those that will disagree with me. We'll see where they go. But they're not going to replace the traditional products that have been used in the market. They are going to find a niche ...

But we are doing very well, as you can see, with the numbers we've thrown out with Proclear, because we believe Proclear and the silicones basically will compete in the same market.

(Resp. UF No 70–71, A Bender Decl., Ex. 12 at 268–69, 271–72.)

The merger between Cooper and Ocular closed on January 6, 2005. (Resp. UF No. 68.) On March 9, 2005, Cooper hosted an earnings call to discuss its first fiscal quarter results. (Resp. UF No. 82.) Robert Weiss, Cooper's COO, stated that as far as the Cooper and Ocular merger was concerned: "The U.S. sales force has been fully integrated, and had its national sales meeting in early February, so we're really going to see the benefits from that point forward." (Bender Decl., Ex. 14 at 295.) Mr. Bender also stated that "[t]he integration of the sales teams in Australia, Canada was quicker than we thought. The U.S. went beautifully well. No glitches." (Bender Decl., Ex. 14 at 297.) With respect to the competition from silicone hydrogel products, Mr. Bender stated: "And of course, I think all of you know Proclear competes head-to-head with the latest hype on the silicone hydrogel products. So we're not only holding our own, but we think we're doing very, very well against the silicon hydrogel products that are being marketed for daily wear." (Bender Decl., Ex. 14 at 293.) He also stated: "Is it a real competitor to Proclear—does it really—does it have an advantage over Proclear—the Proclear material as a daily wear leans? And I'm going to tell you no." (Bender Decl., Ex. 14 at 298.) Mr. Bender also stated that silicone hydrogel "is a niche. The continuous wear market is not going to go away, but it certainly isn't a growth market ... It's a specialty segment of the market. It fits our overall strategy, and we're going after it. On the other hand, we believe Proclear—and you can see results we've had this quarter for gosh sakes. We're doing very well against the daily silicon products." (Bender Decl., Ex. 14 at 298.) Finally, Mr. Bender stated: "I—you know, I get a

little emotional on it, because I think it's a hype. It's just hype all over again, and it makes a lot of sense for continuous wear, high DK. I'm sorry. Makes no sense." (Bender Decl., Ex. 14 at 303.)

On May 2, 2005, Health Products Research [2] data was released. Subsequently, on May 5, 2005, Cooper issued a press release that lowered revenue estimates for the second quarter. (Resp. UF No. 122.) Specifically the release stated:

> CooperVision revenue estimates for the second quarter have been reduced from a range of $195 million to $198 million to a range of $186 million to $188 million. The reduction results primarily from continuing sales force integration, territory realignment and training disruptions following the January 2005 acquisition of Ocular Sciences, Inc. and from continuing high inventory levels of Ocular Science's spherical contact lenses in trade channels in the United States that developed during the nine months prior to the close of the acquisition.

> Commenting on the revised CooperVision second quarter revenue guidance, A. Thomas Bender, Cooper's chairman and chief executive officer noted, "The first quarter contact lens industry market research data that measures patient visits to contact lens fitters, shows that following the acquisition, combined CooperVision/Ocular Sciences product lines actually gained market share in the disposable sphere category from the fourth quarter of 2004. This is the same category that the new silicone hydrogel lenses have entered over the past 12 to 15 months.

> "This supports the case for the drag of high trade inventories on revenue rather than a slow down in the prescribing of

2. HPR is a third-party organization that collects data from eye-care professionals about which lenses they are fitting. Cooper alleges

that it relies on HPR data to measure end user demand for its products. (Cooper Mem. Summary Judgment at 5 n. 2.)

our lenses, and also indicates that silicone hydrogel lenses are competing largely among themselves for market share in this category.

(Bender Decl., Ex. 19 at 392.) Additionally on May 5, 2005, UBS Investment Research issued a report that stated that recently released HPR data was "in line with results from our survey that growth in SH [silicone hydrogel] is not necessarily a function of share gains ... Cooper is not losing significant Proclear business to silicone hydrogel." (Bender Decl., Ex. 26 at 447–48.)

On June 7, 2005, Cooper held its quarterly earnings call to report its second fiscal quarter financial results. Mr. Bender stated that "[w]e are monitoring using Health Products Research data on a monthly basis, any change in our market share, based on these silicone products. At this point, I must tell you, I don't see any impact of the silicone products on our core product in this category which is, of course, our Proclear product." (Bender Decl., Ex. 23 at 417.)

Around August of 2005, Johnson & Johnson launched the Acuvue Oasys as an upgrade to Acuvue Advance. (Resp. UF No. 37.) On November 21, 2005, Cooper issued a press release revising guidance for the fourth fiscal quarter of 2005. (Resp. UF No. 134.) In the press release, Mr. Bender stated: "Our core contact lens business—single-use lenses and specialty lenses including our Proclear line—showed 20% growth worldwide through October. This business accounts for about 60% of CooperVision's worldwide revenue. Our new product pipeline is robust, but new competitive silicone hydrogel entries have hurt our two-week spherical lens business in the United States this year. Our *Proclear* sphere, which competes in this monthly spherical lens category, has been extremely successful, but it has not been able to fully contain the decline in the growth of our two-week *Biomedics* spherical product line." (Resp. UF No. 135.) Following this press release, Cooper's stock price dropped.

## LEGAL STANDARD

Summary judgment is proper if the evidence before the Court "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating either that there are no genuine material issues or that the opposing party lacks sufficient evidence to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. 2548; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). Once this burden has been met, the party resisting the motion "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## ANALYSIS

■ In order to state a claim for securities fraud under Section 10(b) of the Secu-

rities Exchange Act of 1934, a party must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 156–57, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Defendants leverage three principle challenges to the statements that Plaintiffs allege violated Section 10(b). Defendants argue that Plaintiffs have not produced evidence of loss causation as to statements made on December 13, 2004 and March 9, 2005, that Plaintiffs have not produced evidence of falsity or materiality as to any of the statements, and that Plaintiffs have failed to produce any evidence of scienter as to any of the statements alleged to be false or misleading.

■ Plaintiffs bear the burden of proving that Defendants' statements were false or misleading. A material statement of fact is false if it is contradicted by true facts. *In re McKesson HBOC, Inc.,* 126 F.Supp.2d 1248, 1265 (N.D.Cal.2000). In contrast, "[a] projection or statement of belief is a 'factual' misstatement actionable under § 10(b) if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending to seriously undermine the statement's accuracy." *Kaplan v. Rose,* 49 F.3d 1363 (9th Cir.1994); *In re Apollo Group Inc. Sec. Litig.,* 509 F.Supp.2d 837, 844 (D.Ariz. 2007); *In re 2TheMart.com, Inc. Sec. Litig.,* 114 F.Supp.2d 955, 961 (C.D.Cal.2000).

■ Plaintiffs also bear the burden of proving that the statements were material to investors. Generally, materiality is established by "showing that a reasonable shareholder would consider the misrepresentation or omission important, because it altered the total mix of available information." *Provenz v. Miller,* 102 F.3d 1478, 1489 (9th Cir.1996). "Whether an omission is 'material' is a determination that 'requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'" *Provenz,* 102 F.3d at 1489 (quoting *Fecht v. Price,* 70 F.3d 1078, 1080 (9th Cir.1995)). However, "[i]f the disclosure of certain information has no effect on stock prices, it follows that the information disclosed was immaterial as a matter of law." *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1330 (3d Cir.2002).

■ Plaintiffs will also need to demonstrate that the statements at issue were made with scienter. Plaintiffs will need to demonstrate that the defendants had "'a mental state embracing an intent to deceive, manipulate or defraud.'" *Provenz,* 102 F.3d at 1490 (quoting *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1424 (9th Cir.1994)). Plaintiffs will be able to establish scienter by proving "either actual knowledge or recklessness." *Id.* Scienter should *only* be resolved at summary judgment "where 'there is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter.'" *Provenz,* 102 F.3d at 1490 (internal quotation omitted).

■ Finally, Plaintiffs will need to prove loss causation. In order to demonstrate loss causation, a plaintiff must establish: (1) artificial inflation caused by a misrepresentation; (2) a "relevant truth" that was disclosed to the market as to that misrepresentation; and (3) a significant stock decline caused by the revelation of that truth. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342–47, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Metzler Inv.*

*GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir.2008). As Defendants only challenge loss causation as to a limited number of statements, the Court will address that element first, and then will subsequently address the statements based on category.

### 1. Loss Causation

█ As a preliminary matter, Defendants challenge Plaintiffs' ability to prove loss causation as to Mr. Bender's statements made on the December 13, 2004 conference call and to Mr. Weiss's and Mr. Bender's statements made on the March 9, 2005 conference call. Both parties submitted reports of economic experts concerning the degree of inflation caused by all of the alleged misstatements. The experts agree that the December 13, 2004 and March 9, 2005 statements did not increase inflation that may have already been incorporated into Cooper's stock price. Feinstein Report, Ex. 3; Kleidon Rebuttal Report ¶¶ 16–36.[3]

According to Plaintiffs' expert, Dr. Feinstein, the December 13, 2004 and the March 9, 2005 statements maintained the inflation present in the stock price because these conference calls afforded Mr. Bender and Mr. Weiss the opportunity to tell the truth, and they allegedly continued to lie. (Alvarez Decl., Ex. 12 at 161:25–162:18.) Dr. Feinstein conceded that the statements did not add additional inflation to the stock price, and Dr. Feinstein's chart attached to his expert report reflects no change in inflation on either December 13, 2004 or March 9, 2005 or immediately before or after those dates. (Feinstein Report, Ex. 3.) Defendants argue that this makes the statements not actionable as a matter of law. The Court disagrees.

Dr. Feinstein claims that instead of telling the truth, Defendants continued "doubling-down" the alibi for why Ocular's growth was slow. (Alvarez Decl., Ex. 12 at 162:5.) Instead of revealing a relevant truth, Mr. Bender's alleged falsehoods "propped up" the stock price. (Alvarez Decl., Ex. 12 at 163:9–11.) Additionally, Dr. Feinstein stated that "if the truth had been told, then [the stock price] would have fallen ..." (Alvarez Decl., Ex. 12 at 221: 3–4.) Though Defendants' expert disagrees with Plaintiffs' expert, it is disputed as to whether the statements caused artificial inflation to continue to be incorporated into the stock price, as opposed to revealing the truth, which allegedly would have caused the stock price to fall. Accordingly, there are disputed issues of fact as to whether Plaintiffs can establish loss causation.

### 2. Inventory Statements

#### Falsity, Materiality and Scienter

█ Defendants assert that Plaintiffs cannot demonstrate either falsity, materiality or scienter for any of the statements concerning product inventory. The Court disagrees. As a preliminary matter, there is a dispute concerning what, exactly, Mr. Bender meant when he stated on July 29, 2004 that Ocular "allowed that inventory of the old product to decline as they built this new product in. So we looked at that pretty strongly, too, to make sure we didn't have a hurt hunter here." What Mr. Bender meant is an issue of fact. Additionally, assuming Mr. Bender meant to suggest that Cooper had actually investigated Ocular's implementation of its inventory strategy, there are disputed issues of fact as to whether Cooper actually investigated this. In deposition, Mr. Bender testified that he did not personally investigate Ocular's inventory strategy and relied on the due diligence team headed by Mr.

---

3. Defendants leverage several evidentiary objections to evidence that the Court has relied on in this order. These objections are OVERRULED.

Fryling to verify that the strategy was in fact being executed. (Alvarez Decl., Ex. 10 at 65:10–66:8, 80:6–81, 91:24–92:3, 108:12–125:8.) In contrast, Mr. Fryling testified that he did not recall personally verifying that the strategy was being executed. (Alvarez Decl., Ex. 7 at 191:3–194:19, 195:9–208:16.) Plaintiffs have also provided evidence that Ocular may actually have been building up inventory of Biomedics 55, and not reducing it as Mr. Bender suggested in his July and December 2004 statements. For example, Steve Neil, Cooper's CFO, issued a report dated June 23, 2005, re: 2004 Inventory Valuation, in which he stated that "customers did not convert as much business away from Biomedics 55 lens, resulting in the need to carry inventories of both products." (Alvarez Decl., Ex. 87 at COO 06241127–28.) While Defendants assert that this simply means that customers were carrying inventories of both products, a reasonable juror might conclude that this meant that Ocular continued to build Biomedics 55 inventory excessively, which would contradict Mr. Bender's statements that Ocular had leveled off Biomedics 55 distribution. These conflicts persuade the Court that there is a dispute of material fact as to whether Mr. Bender's inventory statements were false or misleading and would be material to an investor. This is also sufficient to create a dispute as to whether the statements were made with scienter.

### 3. Sales Force Integration Statements

**Falsity, Materiality and Scienter**

 Plaintiffs contend that Mr. Weiss's and Mr. Bender's March 9, 2005 state-ments that the integration of Cooper and Ocular's sales forces "went beautifully well" and that the sales forces were "fully integrated" were false or misleading and material. (Opp. at 36.) Defendants assert that Mr. Bender's statement that the integration of the sales forces had gone "beautifully well" is not actionable because it is immaterial as a matter of law as it is "not capable of objective verification' and 'lack[s] a standard against which a reasonable investor could expect [it] to be pegged.'" *In re Impac Mortg.*, 554 F.Supp.2d 1083, 1096 (C.D.Cal.2008). The Court disagrees. Mr. Bender was speaking in the past tense, i.e., he stated that the integration of the U.S. sales force *went* beautifully well, and a reasonable juror could conclude that Mr. Bender meant to convey that the integration had been successfully completed. Accordingly, this statement is capable of objective verification and is therefore actionable.

 Plaintiffs present evidence to demonstrate that as of February 2005, reports from sales managers in the field included phrases like "[w]orking for two separate companies—very cumbersome," and "we need to get the two organizations on the same sheet of music ASAP!" (Alvarez Decl., Ex. 18 at 05371601 and 05371629.)[4] Additionally, Cooper stated on May 5, 2005 that Cooper's revision in guidance was due in part to "continuing sales force integration," (Alvarez Decl., Ex. 75), which appears to conflict with Cooper's original representations that the sales forces were fully integrated as of March 9, 2005. Though the top executives declare that the integration was complete, this appears to conflict with the reports

---

4. Defendants object to Exhibit 18 on hearsay and lack of foundation grounds. Defendants have also filed a motion in limine to exclude all evidence and argument suggesting, stating, implying or inferring that any statement in Cooper's field sales reports is actually true. This objection OVERRULED. The Field Sales Reports are both admissions by a party opponent and business records. Fed.R.Evid. 801(d)(2)(A) and arguably 803(6).

submitted by the employees who were on-the-ground. This is sufficient to create a dispute of material fact as to whether the sales forces integration statements were false or misleading and whether this information would have been material to an investor. Additionally, Mr. Bender acknowledged that he received and would "scan through some" of the sales reports. (Alvarez Decl., Ex. 10 at 134:12–135:4.) Mr. Weiss and Mr. Bender claim that Mr. McLean told them that the sales forces were fully integrated, which they argue negates scienter. (SUF 73, 78.) But Plaintiffs contend that Mr. Bender and Mr. Weiss received the Field Sales Reports after Mr. McLean made his report to them, but before they made their March 9, 2005 statements. This is sufficient to create a dispute of material fact as to whether the statements were made with scienter.

#### 4. Silicone Hydrogel Statements

Finally, Plaintiffs contend that the statements made concerning competition from silicone hydrogel lenses were false or misleading and would have been material to an investor. The Court agrees that there are issues of material fact as to whether some of Mr. Bender's statements concerning the threat that silicone hydrogel lenses posed to Cooper's business were false or misleading and material.

##### a. Falsity and Materiality

###### i. December 13, 2004 and March 9, 2005 Statements

■ Defendants argue that the term "niche" is not actionable because it is not capable of objective verification and lacks a standard against which a reasonable investor could expect it to be pegged. *Impac,* 554 F.Supp.2d at 1096. "Statements that fall within [this] rule tend to use terms that are not measurable and not tethered to facts that a reasonable person would deem important to a securities investment decision." *In re Cornerstone*

*Propane Partners, L.P. Sec. Litig.,* 355 F.Supp.2d 1069, 1087 (N.D.Cal.2005); *In re Splash Technology Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1076–77 (N.D.Cal.2001). The Court agrees. The term 'niche' is comparable to corporate phrases of optimism like "very well" and "strong," which are both vague and imprecise ways of describing a product's import or performance. Similarly here, Mr. Bender's statement that silicone hydrogel would be a "niche" product is too vague to be measurable and is therefore immaterial as a matter of law.

■ Defendants also argue that Mr. Bender's statement on March 9, 2005 that "we think we're doing very, very well against the silicon hydrogel products" and "[w]e're doing very well" against silicone hydrogel lenses are not actionable. The Court does not agree. While it is true that courts have previously held that statements like, "doing very well" are "nothing more than 'puffing,' which reasonable investors know do not guarantee future success," *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1095 (N.D.Cal.1994), Mr. Bender's statement must be taken in context. Mr. Bender was making specific statements about Proclear's competition with silicone hydrogel products and stated that Proclear was doing very, very well against silicone hydrogel. If, in fact, Proclear was doing very poorly against silicone hydrogel lenses, then the statement could be false. Additionally, Plaintiffs have presented evidence that Cooper acknowledged in internal documents that it was "out of play" and in the long run "could be at a major disadvantage" because it did not have a silicone hydrogel lens. (Alvarez Decl., Ex. 63 at COO 00017922.) Another internal memorandum stated that one of the reasons for a February 2005 revenue shortfall was that "[p]roduct performance has been impacted

by significant declines in the harvest line and spheres impacted by silicon hydrogel (siho) noise." (Alvarez Decl., Ex. 37 at COO 05016264.) This is sufficient to create a dispute of material fact as to whether the statement was false or misleading.

### ii. May 5, 2005 Statement

██ In the May 5, 2005 press release, Cooper announced that it was revising revenue guidance for the second quarter. (Bender Decl., Ex. 19.) Mr. Bender was quoted as saying that "[t]he first quarter contact lens industry market research data that measures patient visits to contact lens fitters shows that following the acquisition, combined CooperVision/Ocular Sciences product lines actually gained market share in the disposable sphere category from fourth quarter of 2004. This is the same category that the new silicone hydrogel lenses have entered over the past 12 to 15 months. This ... indicates that silicone hydrogel lenses are competing largely among themselves for market share [in the disposable sphere] category." (Bender Decl., Ex. 19.) Plaintiffs contend that Mr. Bender's statement that "silicone hydrogel lenses are competing largely among themselves for market share" was false or misleading and material. Not surprisingly, Defendants argue that Plaintiffs have no evidence to support this proposition.

Following the release of the HPR data on May 2, 2005, to which Mr. Bender referred in the press release, Cooper's stock price declined. (Meng Decl., Ex. 39 at ¶¶ 25–26, Ex. 4.) Cooper stated that the resulting revenue guidance revision announced on May 5, 2005, was due to "continuing sales force integration, territory realignment and training disruptions following the January 2005 acquisition of Ocular Sciences, Inc. and from continuing high inventory levels of Ocular Science's spherical contact lenses in trade channels in the United States that developed during the nine months prior to the close of the

acquisition." (Alvarez Decl., Ex. 75 at COO 03014640.) Plaintiffs have produced evidence that Cooper knew but was attempting to conceal the fact that its lowered revenue estimates were also due to competition from silicone hydrogel lenses. Plaintiffs have provided evidence that following the release of the HPR data, Mr. Bender communicated with the Senior Director of Marketing, Michael Menard to request "additional insight on the HPR data." (Alvarez Decl., Ex. 5 at 231:19–232:1.) Mr. Menard testified that Mr. Bender was "looking for some further information on two-week disposable categories." (Alvarez Decl., Ex. 5 at 234:5–11.) Mr. Bender was also looking for information about "[g]eneral market conditions," and Plaintiffs have provided evidence of Mr. Menard's analysis. In an email to Mr. Bender, dated May 3, 2005, Mr. Menard stated that "OSI 2 week share for private labels in Mass an[d] high volume retail is eroding so quickly it is tough to get a real fix on the rate of decline. The new news brought by Advance and 02 Optix in the 2 week ca[t]egory was long overdue as seen in the vol. of 2 week fits increasing faster than the entire market. The OSI aspheric was 12 to 18 mos too late into the market." (Alvarez Decl., Ex. 46.) Mr. Menard also indicated that "SIOH introductions have increased new fit activity for 2 week." (Alvarez Decl., Ex. 47.) Plaintiffs also produced evidence that on May 3, 2005, Norris Battin, Cooper's Vice President of Investor Relations, wrote in response to the question: "I notice your stock has broken below $60. What's going on? ?," "Main issues is silicone hydrogel competition; some other smaller things, too." (Alvarez Decl., Ex. 62.)

In addition, Plaintiffs have presented emails between Mr. Fryling and other Cooper officers, pre-dating the May 2005 conference call, in which he appeared to be strategizing about how to prevent Cooper

from losing market share to silicone lenses. (Alvarez Decl., Ex. 50.) He proposed "a Pepsi challenge against the 2 week silicone lenses. We could identify those chains where we are loosing [sic] the most amount of hydro gel business." (Alvarez Decl., Ex. 50.) Some of the emails also reflect concerns that Ciba Vision was launching a new product and aiming "to kill Biomedics 55," and Mr. Fryling's response was that this news reconfirmed their "strategy to put as much focus as possible on Proclear until we can obtain our own silicone product." (Alvarez Decl., Ex. 57.) Plaintiffs also produced Mr. Weiss's personal notes, dated March 23, 2005, in which he wrote: "Biomedics Spheres being beat up with SIHO." (Alvarez Decl., Ex. 72 at COO 00018079, Ex. 9 at 333:25–224:25.) This evidence is sufficient to create a dispute of material fact as to whether Cooper's representations on May 5, 2005 concerning silicone hydrogel competition were false or misleading and material.

### iii. June 7, 2005 Statement

During Cooper's regular quarterly earnings call to report second quarter financial results on June 7, 2005, Mr. Bender stated that he did not "see any impact of the silicone products on our core product in this category which is, of course, our Proclear product." Defendants argue that the term "impact" is not "capable of objective verification" and ·is therefore not actionable. *Impac*, 554 F.Supp.2d at 1096. While this is a closer call, Mr. Bender did state that he did not see *any* impact of silicone products on the Proclear product. It is possible to determine whether there was any impact of the silicone products on Proclear, which would enable a reasonable juror to determine whether Mr. Bender's statement was either false or misleading and material.

Additionally, Plaintiffs provided an internal memorandum prepared by Vice President of U.S. Marketing, Tom Shone, sent to Mr. Bender in an email dated June 3, 2005, which stated that "recent product entries by J & J (Acuvue Advance) and Ciba (02 Optix) have made premium materials available in the 2 week market (2 wk SIOH). These moves have put serious pressure on our core 2 week hydrogel business." (Alvarez Decl., Ex. 33, 83.) The memo also stated that "[a]ttempts to position Proclear Compatibles more aggressively against 2 week SIOH have been met with marginal acceptance," and "our attempts to compete directly against 2wk SIOH products will be met with limited success." (Alvarez Decl., Ex. 33 at COO 04727796.) The "March 2005 highlights" memorandum also stated that there were three current U.S. issues challenging the team, the first of which was "[m]aintaining current share position in the disposable sphere category due to the increased competitive pressure relating to silicon hydrogel products." (Alvarez Decl., Ex. 127 at COO 00194554, Ex. 83.) The memo also stated that the "U.S. organization is under intense competitive pressure, especially as it relates to our sphere portfolio. The market noise around silicon hydrogel products is extremely high." (Alvarez Decl., Ex. 127 at COO 0019554.) Plaintiffs have also provided memoranda from field representatives dated between April 2004 and May 2005 that appear to document the recurring theme that Cooper desperately needed a silicone hydrogel product if it hoped to continue to compete effectively in the spherical market. (Alvarez Decl., Exs. 14–21, 110, 113.) This evidence is sufficient to create a dispute of material fact as to whether Mr. Bender's statement was false or misleading and whether it was material.

### b. Scienter

Defendants also argue that Plaintiffs are unable to establish that

statements concerning silicone hydrogel competition were made with scienter. Defendants submit declarations from Mr. Bender, Mr. Weiss and Mr. Fryling in which they state that they "genuinely believed" these statements when they were made. As noted previously, Plaintiffs have provided internal documents that suggest that Defendants either knew or were reckless in not knowing that Cooper's market share was potentially declining due to competition from silicone hydrogel products. Ex. 39, Ex. 42, Ex. 48, Ex. 46–47, Ex. 33. This evidence is sufficient to create a dispute of material fact as to whether the statements concerning silicone hydrogel were made with scienter.

### 5. Weiss and Fryling Liability for Statements Made by Others

#### i. Section 10(b)

██ Mr. Weiss argues that regardless of his liability for his statement concerning sales force integration, he cannot be held liable for any remaining statements because Plaintiffs cannot demonstrate either that he personally wrote the words or had substantial participation or intricate involvement in their preparation. Similarly, Mr. Fryling asserts that since he did not say any of the statements that Plaintiffs currently allege are false, he cannot be held liable for any of the allegedly false statements. The Ninth Circuit has held that in order to state a § 10(b) violation, Plaintiffs must prove, with respect to at least one of the challenged statements, that a Defendant either (1) personally spoke or wrote the words, or (2) had "substantial participation or intricate involvement in the preparation" of them. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n. 5 (9th Cir.2000).

There are issues of fact as to whether either Mr. Fryling or Mr. Weiss had substantial participation or intricate involve-ment in preparing the allegedly false statements. Mr. Fryling testified that he met with Mr. Bender and Mr. Weiss to help them prepare for investor conference calls. (Alvarez Decl., Ex. 7 at 156:7–157:4.) Plaintiffs also point to Mr. Bender's testimony, in which he stated that he used feedback from Mr. Fryling when he made his inventory statements. (Alvarez Decl., Ex. 10 at 64:7–12, 114:11–16, 123:10–24.) Mr. Bender reported that both Mr. Weiss and all of CooperVision management reviewed the May 5, 2005 press release. (Alvarez Decl., Ex. 10 at 174:10–176:12.) Mr. Battin testified that press releases from the Cooper Companies were reviewed by management. (Alvarez Decl., Ex 8 at 29:8–13.) This is sufficient to create a dispute of fact as to whether either Mr. Weiss or Mr. Fryling had substantial participation or intricate involvement in the false statements.

#### ii. Section 20(a)

██ Defendants also assert that Mr. Weiss and Mr. Fryling are not liable as a control person under § 20(a) of the Securities Exchange Act. In order to prove liability under § 20(a), Plaintiffs must prove: (1) a primary violation of the federal securities laws; and (2) that the Defendant, whether directly or indirectly, exercised actual power or control over the primary violator. *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996). Whether a Defendant is a "controlling person 'is an intensely factual question,' involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'" *Kaplan*, 49 F.3d at 1382 (citing *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396–97 (9th Cir.1993)). The Ninth Circuit has acknowledged that the "SEC has defined 'control' to mean: '[T]he possession, direct or indirect, of the power to direct or cause the direction

of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.'" 17 C.F.R. § 230.405; *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 n. 9 (9th Cir.2000). Good faith is an affirmative defense to a § 20(a) claim. *Id.* As the Court has already found that there are disputed issues as to whether there was a primary § 10(b) violation, the only remaining question is whether there is a material issue as to whether either Mr. Fryling or Mr. Weiss exercised actual power or control over the primary violator.

### 1. Mr. Fryling

 Mr. Fryling was not an officer of Cooper. (Fryling Decl. ¶ 7.) Rather, he was COO of Cooper's subsidiary, CooperVision, from October of 2003 to January of 2005, at which point he became the President of CooperVision. (Fryling Decl. ¶ 3.) It is undisputed that Mr. Fryling reported to Mr. Bender before January of 2005. (Fryling Decl. ¶ 5.) It also is undisputed that Mr. Fryling reported to Mr. Weiss starting around January of 2005. (Fryling Decl. ¶ 5; Weiss Decl. ¶ 5.) It is difficult to understand how Mr. Fryling could have exercised actual power and control over Cooper's officers when he was an officer of Cooper's subsidiary, CooperVision. *Middlesex Retirement Sys. v. Quest Software Inc.,* 527 F.Supp.2d 1164 (C.D.Cal.2007). In *Middlesex,* the Court determined that Plaintiffs had insufficiently pled control person liability against a Vice President where the other § 10(b) Defendants held positions of Vice President or higher. *Id.* at 1194. This situation is similar.

As evidence that Mr. Fryling exercised actual power or control, Plaintiffs point to Mr. Bender's testimony that Mr. Fryling was involved in the decision to purchase Ocular and managed due diligence in connection with the merger. (Alvarez Decl., Ex. 10 at 64:7–12, 114:11–6.) What Plaintiffs fail to confront, however, is that Mr. Fryling stated in his sworn declaration that he put together a plan and team for due diligence at Mr. Bender's direction. (Fryling Decl. ¶ 10.) Plaintiffs also point to the fact that Mr. Fryling testified that he would provide management reports on CooperVision business to Mr. Bender and Mr. Weiss to help them prepare for the conference calls, and Mr. Bender and Mr. Weiss would follow up with questions. (Alvarez Decl., Ex. 7 at 156:13–157:4.) While Mr. Fryling clearly had input, this evidence is not sufficient to demonstrate that he exercised actual power or control over Cooper policy or management or over Mr. Bender or Mr. Weiss. Accordingly, Defendants' summary judgment motion is GRANTED as to Mr. Fryling's § 20(a) liability.

### 2. Mr. Weiss

 It is undisputed that Mr. Weiss was Cooper's COO during the class period. Mr. Fryling testified that both Mr. Bender and Mr. Weiss were included on all emails where management was "trying to understand what was going on with the business," and Mr. Weiss had continuing access to Field Sales Reports. (Alvarez Decl., Ex. 7 at 259:12–17; 89:16–17.) Mr. Bender also shared his analysis of HPR data with Mr. Weiss. (Alvarez Decl., Ex. 10 at 58:5–25.) This evidence is sufficient to create a dispute of material fact as to whether Mr. Weiss exercised actual power and control over the day-to-day Cooper activities, and accordingly, whether he can be held liable as a control person.

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED in substantial part.